Frederick L. ELMORE, Plaintiff-Respondent,

v.

MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Defendant-Appellant.

No. 45420.

Supreme Court of Missouri,

Division No. 1.

April 8, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied May 13, 1957.

Harold L. Harvey, Marvin Boisseau, Jr., D. B. Sommers, St. Louis, for appellant.

Charles E. Gray, St. Louis, Terry, Jones & Welton, Kansas City, for respondent.

DALTON, Judge.

Action for damages under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for personal injuries (dermatitis) alleged to have been sustained by plaintiff in the course of his employment by reason of contact with sodium bichromate, a rust inhibitor used by defendant in the cooling system of diesel engines. Verdict and judgment were for plaintiff for $25,000. Defendant has appealed and assigns error on the giving of plaintiff's instructions Nos. 2 and 7 and on an alleged excessive verdict. There is no contention that a submissible

case was not made for the jury. We shall continue to refer to the parties as plaintiff and defendant.

Plaintiff's evidence tended to show that he worked for defendant from 1924 until December 23, 1953, when he terminated his employment on account of dermatitis. He was a machinist's helper, employed in inspection and repair work, and first began work on diesel engines in August 1952. He was permanently transferred to that work about October 1, 1952. In previous work he had always been in contact with oils and greases, but they had never bothered him and he had never had anything wrong with his skin. When he was transferred to the diesel shop, he began work on switch engines, filling radiators, putting on brake shoes and doing general machinist work, including the making of inspections. In this work he had his first contact with sodium bichromate and the crankcase lubricating oil used in the diesels. Most of his work was on switch engines, although he did some work on freight and passenger engines. For the most part, his work was in the open, outside the big shop building in the St. Louis yard.

It was part of his work to put sodium bichromate (also referred to as Dearborn 517, and as chromate or chromates) in the radiators and cooling system of the diesel switch engines. He would take a two pound bag of that material, empty it into a five gallon bucket of water, stir it up to dissolve the material, place the bucket on the running board of the engine and then get a ladder and carry the bucket up and unscrew the radiator cap and pour the mixture in the radiator of the engine. The bucket had no cover, and the mixture would splash out in handling or spill when being poured into the radiator and plaintiff would get the mixture on his body, hands, feet and legs. He also came in contact with chromate solutions in his work in other ways, as in the crankcase oils, on the floor of the shop, or when he would lay his tool on the floor. When he was underneath the ramps in making inspections, or rolling wheels, the chromate solutions would drip on his head and neck. When he was changing lubricating oil filters or handling oil covered parts, he would get solutions of the material on him and it would be all about him in his work. Frequently, he would have to be under engines making inspections shortly after they had been on the wash racks and water containing chromate solution would drip on him.

The solutions of sodium bichromate would get on the engines when radiators would boil over and the blowers would blow the solution back, or solutions would be spilled on the engine in filling the radiators or when the radiators would overflow from being filled too full, or when there would be leakage about the engine or pumps or pipes, or when cooling equipment would crack or break. If machinist work had to be done on the radiators or cooling systems of the engines, they often had to be drained and the solution of sodium bichromate would splash out on the floor of the shop, or fail to get in the little gravity channels for draining it off, or, if the radiators were drained in the open and the drainage hose was not used, the cooling water, a yellowish green containing the chromate solution, would be drained on the ground. In case of leaks, the chromate solution would sometimes get into the crankcase lubricating oil and on the parts of the engines with which plaintiff came in contact. There would be yellow streaks on the roof, sides and running boards of the engines where solutions of chromates had been spilled and dried. The yellow streaks of chromate would sometimes extend down to the trucks of the engines and on the brake shoes. The engines were not washed often, and sometimes the men worked on them before they were washed, or just afterwards. According to plaintiff, the switch engines were washed every fifteen to thirty days, freight engines, as a rule, after they were ready to be dispatched, and passenger engines every time they came in. Sometimes after the engines were washed you could still see the streaks of chromates. You had

to come in contact with solutions of sodium bichromate in making inspections and doing machinist work on the engines. It would be "pretty hard" not to come in contact with the chromates in doing machinist work. Plaintiff said there was no way "to keep that stuff off of you all together." One of plaintiff's witnesses said "generally speaking I would say I don't know how you could prevent it." There was evidence that sodium bichromate and other such compounds were very definitely known as irritants; that they would cause skin irritation; that they were poisonous and, when applied to the skin, they would cause redness and breaking out. Other witnesses said that the best preventative of dermatitis from exposure to sodium bichromate was not cleanliness, but to "stay away from it"; that, if possible, industry should substitute some other chemical for sodium bichromate; and that "exposure to the solution should be kept at an absolute minimum."

About the middle of October 1952, plaintiff's hands started breaking out in a rash and itching so much that he "could hardly stand it." Later, there was more breaking out on his hands and the irritation developed until there was bleeding, pus and running sores. If he was away from contact with the chromate solutions the sores would clear up, but there still would be continuous itching and, if he came back to his work, his skin would break out again. His condition continually got worse, until he had sores on his hands, arms, head and neck, his eyelids became swollen and, ultimately, it became necessary for him to terminate his employment with defendant in December 1953. It will be unnecessary to further review the evidence with reference to plaintiff's physical condition, the dermatitis of which he suffers, or his sensitivity to various substances.

In view of the issues presented, it will not be necessary to review the evidence presented by plaintiff in support of his assignment that defendant negligently failed to furnish plaintiff with any creams to be used on the exposed portions of his body, until after his injuries were sustained, and negligently failed to furnish reasonably adequate' and available washing facilities, soaps and towels, so that plaintiff could remove the sodium bichromate solutions from his body after exposure thereto. This assignment was submitted by plaintiff's instruction No. 3. Nor will it be necessary to review plaintiff's evidence in support of his assignment of negligence that defendant negligently failed to warn the plaintiff that the substance (sodium bichromate) might have a harmful effect upon him, as submitted by plaintiff's instruction No. 4. Nor need we review the evidence offered by defendant tending to support defendant's instruction No. 5, which advised the jury that defendant railroad was not the insurer of the safety of its employees, but only had the duty to exercise reasonable care to provide its employees with a reasonably safe place in which to work. The instruction submitted a finding that if "the defendant railroad exercised reasonable care to wash and clean the diesel locomotives upon which plaintiff worked before he was required to work upon them, and if * * * the defendant exercised reasonable care to wash and clean the diesel shop wherein plaintiff was required to work, and exercised reasonable care to prevent substances likely to cause injury to the plaintiff from being deposited and remain on the floors, parts and equipment of the diesel engines and diesel shops and the area surrounding the diesel shop where plaintiff worked; and if * * * the defendant exercised reasonable care to provide its employees with adequate facilities for personal cleanliness and hygiene, and exercised reasonable care to furnish reasonable, adequate and available washing facilities, soaps and towels, so that plaintiff could in performance of his work have such facilities available so that he could remove irritating substances to which he may have been exposed in his work, if any; and if * * * the defendant exercised reasonable care to instruct and to warn its employees, including plaintiff, to use said facilities for personal cleanliness and hygiene in order to prevent skin

irritation and skin disease \* \* \* and if \* \* \* under all the facts and circumstances mentioned in evidence, the defendant exercised reasonable care to provide its employees, including plaintiff, with a reasonably safe place in which to work, and was not negligent, then your verdict must be for and not against the defendant railroad."

In addition, it should be said, that defendant offered evidence tending to show that defendant had 225 Alco, "244 series," engines that it protected from rust "with this chromate treatment," as these engines were particularly susceptible to severe corrosion which resulted in damage to the engines and in delay of the trains. About one-third of defendant's engines were of this series. Other rust inhibitor materials could be used on defendant's other engines, such as the Baldwins and the Electromotives, but these substances were not satisfactory for use in the Alco engines.

Instruction No. 2, of which defendant complains, expressly submitted to the jury a finding that defendant was negligent *"in causing and permitting said sodium bichromate to become deposited on or about the floors, parts, and equipment of the diesel engines, the diesel shop, and the area surrounding the diesel shop where plaintiff worked."* (Italics ours.)

■ It appears, therefore, that plaintiff submitted his case to the jury upon three separate verdicts directing instructions, to wit, instructions Nos. 2, 3, and 4, each on a different theory of negligence. While it was not necessary (as plaintiff says) for the plaintiff to require the jury to find that defendant was negligent in all three respects submitted, still, if one of the three instructions was erroneous as a matter of law, or was unsupported by evidence, the verdict for plaintiff cannot stand because the jury may have based their verdict upon the erroneous instruction. Carlisle v. Tilghmon, Mo.Sup., 159 S.W.2d 663, 665(4); Berry v. Chicago & A. R. Co., Mo.App., 208 S.W.

622, 623; Monsour v. Excelsior Tobacco Co., Mo.App., 115 S.W.2d 219, 224(14).

Before considering the objections leveled against plaintiff's instruction No. 2, it will be necessary to set the instruction out in full, since plaintiff relies upon its effect considered as a whole. The instruction is as follows:

"The Court instructs the jury that if you find and believe from the evidence that during the time plaintiff worked on the diesel locomotives mentioned in the evidence, the defendant used in the cooling system of such diesel locomotives a compound containing sodium bichromate; and if you further find and believe from the evidence that such compound was used under circumstances and conditions so that it would and did become deposited on and about the floors, parts, and equipment of the diesel engines, the diesel shop, and areas surrounding the diesel shop, and that plaintiff in his work had to and did come in contact with such conditions and substance and liquid cooling solution containing sodium bichromate, and that he would and did get it on his body in quantities likely to cause harmful results to him, if you so find; and if you further find and believe from the evidence that defendant knew or in the exercise of ordinary care should have known that plaintiff in performing his work had to and did come in such contact with said sodium bichromate; and if you further find and believe from the evidence that said sodium bichromate was irritating and harmful to the skin of a human being, and that it would reasonably likely cause eruptions, rash, or dermatitis to some of the employees of defendant coming in contact with such substance in their work; and if your further find and believe from the evidence that by the exercise of ordinary care such as an ordinary, careful, and prudent person would exercise under the same or similar circumstances for the reasonable safety of their employees in their work, the defendant knew or should have known and realized that such substance was reasonably likely to cause

such harmful results to some of the employees so engaged in doing the type of work that plaintiff was required to do, and knew or in the exercise of ordinary care should have known thereof while and during the time said substance was being used, and plaintiff was so coming into contact therewith, if you find plaintiff did come in contact therewith; and if you further find and believe from the evidence that in so coming into contact with said sodium bichromate, plaintiff sustained eruptions, rashes and dermatitis to his body as a direct result thereof; and if you *further find and believe from the evidence that the diesel engines, diesel shop, and the area surrounding the diesel shop where plaintiff was required to work were not reasonably safe places of employment due to the presence of the sodium bichromate as aforesaid; and if you further find and believe from the evidence that in causing and permitting said sodium bichromate to become deposited on or about the floors, parts, and equipment of the diesel engines, the diesel shop, and the area surrounding the diesel shop where plaintiff worked, the defendant was negligent;* and if you further find and believe from the evidence that such negligence in whole or in part directly resulted in and caused injuries to plaintiff, Fred Elmore, then you are instructed that your verdict should be in favor of plaintiff and against defendant, and you should fix plaintiff's damages, if any, in accordance with the other instructions given you herein." (Italics ours.)

Defendant contends that instruction No. 2 is unsupported by evidence, even though the other submissions are supported by evidence; and that the instruction is erroneous (1) because it allows the jury to return a verdict for plaintiff "merely upon a finding that a dangerous substance was used in defendant's business and was caused to be deposited at places where plaintiff would come into contact with said substance"; (2) because "it ignores the question of whether defendant's efforts to prevent injury were reasonable," which was defendant's theory of defense in the case,

to wit, that defendant did know of the dangerous propensities of sodium bichromate and, with such knowledge, it took reasonable and adequate steps to prevent injury; and (3) because it allowed the jury "to find for plaintiff even though it may also have found that the defendant exercised reasonable care to prevent substances from being deposited and remain on the floors, parts and equipment of the diesel engines and diesel shops and the area surrounding the diesel shop where plaintiff worked, and exercised reasonable care to provide its employees with adequate facilities for personal cleanliness and hygiene, soaps, towels, washing facilities and (exercised reasonable care) to instruct and to warn its employees including plaintiff, as to the use of such facilities in order to prevent skin disease, all as submitted to the jury in instruction No. 5." Defendant further points out that the jury could well have found for the defendant and against the plaintiff on plaintiff's instructions Nos. 3 and 4 and still have found for the plaintiff and against defendant under plaintiff's instruction No. 2, which the defendant says directly conflicted with defendant's instruction No. 5.

It should be noted that the specific negligence submitted by instruction No. 2 was negligence *"in causing and permitting said sodium bichromate to become deposited on or about the floors, parts,"* et cetera, where plaintiff was required to work. It did not submit negligence in failing to remove the sodium bichromate or in not exercising reasonable care to do so, nor did it submit negligence in permitting sodium bichromate *to remain* where it was deposited, nor in failing to make the place of work reasonably safe by removing the sodium bichromate.

Plaintiff, however, construes instruction No. 2 as having submitted to the jury the issue of defendant's negligence in requiring plaintiff to work in a place that was not a reasonably safe place of employment due to defendant's negligence in permitting chromates to be deposited on the floors,

parts, and equipment of the diesel engines, diesel shop and area surrounding the diesel shop when plaintiff was required to work therein. Plaintiff says that instruction No. 2 is a correct instruction on plaintiff's theory of the case; that it does not conflict with, nor is it irreconcilable with, defendant's instruction No. 5, which plaintiff says submitted defendant's defense. Plaintiff insists that the instruction is not erroneous for ignoring the question of whether defendant's efforts to prevent injury by other means were reasonable because, according to plaintiff, "there is no evidence that defendant took adequate steps to prevent injury." Plaintiff, however, admits "there was a big dispute as to the adequacy of the washing facilities" and that plaintiff has not contested instruction No. 3, which submitted this issue. Plaintiff, also, says that, if defendant was negligent under instruction No. 2, and plaintiff sustained injury as a result thereof, then plaintiff was entitled to recover regardless of whether defendant may have acted reasonably in some other manner; that plaintiff's instruction No. 2 was not required to negative an alleged defense especially where this defense is set out in defendant's instruction No. 5; and that, even if defendant was compelled to use chromates, which in turn caused the working conditions to be inherently dangerous, this would not relieve defendant of exercising ordinary care to avoid enhancing the natural risk of plaintiff's employment. The cases cited deal with negligence in failing to exercise ordinary care to provide the employee with a reasonably safe place in which to work and to avoid enhancement of the natural risks of his employment. Plaintiff further contends that "defendant by its verdict-directing instruction No. 5 required the jury to find that 'defendant railroad exercised reasonable care to wash and clean its diesel locomotive upon which plaintiff worked before he was required to work upon them,'" and submitted that issue to the jury. Plaintiff construes defendant's instruction No. 5 as "a counter instruction to these three acts of negligence" submitted, respectively, by plaintiff's instructions Nos. 2, 3, and 4.

Plaintiff, in a further effort to support instruction No. 2 states: "It is quite clear that the negligence submitted in this instruction was the negligence of defendant in permitting the chromates to be where plaintiff was required to work *when* he was required to work there. Thus, it clearly requires a finding that defendant negligently permitted the chromates 'to remain' in these places up to and including the time that plaintiff was required to work there." Plaintiff also contends that by instruction No. 5 the defendant conceded that the issue of negligence in failing to provide plaintiff a reasonably safe place in which to work was submitted to the jury by plaintiff's instruction No. 2; and that defendant, having joined in that submission by giving instruction No. 5, may not now complain.

It will be noted that plaintiff makes no effort to support the instruction on the specific ground of negligence submitted therein, to wit, negligence *"in causing and permitting* said sodium bichromate *to become deposited* on or about the floors, parts, and equipment of the diesel engines, the diesel shop, and the area surrounding the diesel shop where plaintiff worked." (Italics ours.) Nor was any such negligence alleged in plaintiff's petition. It was alleged that sodium bichromate was an inherently dangerous substance and that defendant was negligent in subjecting its employees, including plaintiff, to the dangers thereof. It was further alleged that defendant was negligent "in failing to warn plaintiff of the dangers of working in and about such inherently dangerous substance; * * * in failing to furnish plaintiff with protective devices and means of avoiding the dangers of the injurious substances to which he was subjected"; and "in failing to provide plaintiff with a reasonably safe place in which to work." In the course of the trial, plaintiff's counsel also took the position that sodium bichromate was a dangerous substance and that defendant "should not un-

der any circumstances be using it." Defendant conceded that sodium bichromate was a dangerous substance that could cause skin irritation; and that there was danger of dermatitis resulting from contact with it, but defendant's position was that all necessary and reasonable steps had been taken to prevent dermatitis by warnings and preventative measures to protect its employees from these dangers.

■ Our conclusion is that instruction No. 2 is erroneous, misleading and highly prejudicial. While it submitted a finding that the places "where plaintiff was required to work were not reasonably safe places of employment due to the presence of sodium bichromate," the instruction required no finding of negligence with reference thereto. It did not submit a finding that defendant had failed to exercise ordinary care to furnish plaintiff a reasonably safe place in which to work. The effect of said instruction, under the facts of this case, was to direct a verdict against defendant because it was using the dangerous substance in its business, and had caused and permitted this substance to become deposited over the engines, equipment and places where plaintiff worked. However, as we shall see, the defendant owed plaintiff no duty not to use, deposit or cause to be deposited the dangerous substance where plaintiff worked. It appears from plaintiff's evidence that the sodium bichromate solution sometimes got into the lubricating oil of the diesels, and upon engines and equipment, from breaks in the cooling system and from cracks and breaks in the pipes, as well as in other ways. Plaintiff himself spilled chromate solutions on the engines in doing his work. Negligence in permitting the substance *to remain* where it was deposited was not submitted by the instruction. Liability was imposed without reference to the exercise of care in seeking to remove the sodium bichromate, or to warn employees of the dangers, or to protect them from injuries resulting from contact with the dangerous substance, or to provide a reasonably safe place in which to

work. The instruction necessarily conflicted with defendant's instruction No. 5, which directed a verdict for defendant upon a finding of the facts therein submitted concerning the care exercised by defendant to prevent dermatitis as a result of contact with sodium bichromate.

The rule applicable to dangerous instrumentalities, places and substances, is well stated in 56 C.J.S., Master and Servant, § 214(a), p. 922, as follows: "Negligence may not be imputed to a master merely by reason of the fact that the instrumentalities or places furnished by him are dangerous; but where the services required of a servant are of a peculiarly dangerous character it is the duty of the master to make reasonable provisions to protect him from the dangers to which he is exposed while in the discharge of his duties, and he must avoid enhancing the natural risks of the employment. He must furnish suitable appliances for the dangerous work, such as appliances in general use for such work." And see 35 Am.Jur. 550, Master and Servant, Sec. 121. The rule stated has been recognized in many cases, as hereinafter indicated.

■ An employer may not be held liable for injury or death of an employee on the theory of having furnished an unsafe place to work, if the unsafeness is inherent in the work itself, and he may not be held guilty of negligence merely because he knows that the business is of a dangerous character and yet sets his employee to work at it. Before an employer who is engaged in business of a dangerous character may be held liable for injury or death of employee, it must appear that the dangerous condition attending the place of work was not only reasonably subject to be remedied or abated, but also that the employer failed to take those steps which an ordinarily prudent person would have taken in order to eliminate it. Morton v. Alton R. Co., Mo.App., 118 S.W.2d 59.

"It will not do to hold a defendant guilty of negligence merely because it knows the business it is engaged in is of a dangerous

character and sets one of its servants to work at such dangerous business. In order to make liability for negligence in such cases, it must be pleaded, proven, and found that, knowing of such dangerous condition, it failed to take the proper steps to eliminate it, such as an ordinarily prudent person would take, or failed to notify the servant of the dangerous condition." McDonald v. Morrison Plumbing & Sheet Metal Co., 209 Mo.App. 23, 236 S.W. 418, 420; Henderson v. Wilson Stove & Mfg. Co., Mo. App., 197 S.W. 177, 180; Reickert v. Hammond Packing Co., 136 Mo.App. 565, 118 S.W. 525; Berry v. Kansas City, 128 Mo. App. 374, 377, 107 S.W. 415; Kimberlin v. Southwestern Bell Telephone Co., Mo.App., 206 S.W. 430, 432(3). In the latter case, the court said: "Of course liability because of unsafe place would not arise if the unsafeness was inherent in the very doing of the work itself or the dangerous condition was one of the things to be remedied."

In the case of Mather v. Rillston, 156 U.S. 391, 398, 15 S.Ct. 464, 467, 39 L.Ed. 464, the court said: "All occupations producing articles or works of necessity, utility, or convenience may undoubtedly be carried on, and competent persons, familiar with the business and having sufficient skill therein may properly be employed upon them; but in such cases, where the occupation is attended with danger to life, body, or limb, it is incumbent on the promoters thereof and the employers of others thereon to take all reasonable and needed precautions to secure safety to the persons engaged in their prosecution, and for any negligence in this respect, from which injury follows to the persons engaged, the promoters or the employers may be held responsible and mulcted to the extent of the injury inflicted. * * * So, too, if persons engaged in dangerous occupations are not informed of the accompanying dangers by the promoters thereof, or by the employers of laborers thereon, and such laborers remain in ignorance of the dangers, and suffer in consequence, the employers will also be chargeable for the injuries

sustained. * * * These two conditions of liability of parties employing laborers in hazardous occupations are of the highest importance, and should be in all cases strictly enforced."

In the case of Evinger v. Thompson, 364 Mo. 658, 265 S.W.2d 726, 732, this court said: "If defendant could reasonably foresee that a considerable number of its employees would be so affected (that is, develop dermatitis from exposure to chrome compounds), it would have the duty to exercise due care to prevent such injury." (The part in parenthesis is ours.)

In McGivern v. Northern Pac. Ry. Co., 8 Cir., 132 F.2d 213, 217, the court said: "The duty of providing a reasonably safe place in which to work and reasonably safe appliances with which to work while a continuing one does not obligate the employer to keep the place of work safe at every moment where such safety may depend on the due performances of work by the servant and his fellow workmen. Kreigh v. Westinghouse, C., K. & Co., 214 U.S. 249, 29 S.Ct. 619, 53 L.Ed. 984. In fact the rule is held not to be applicable where the workmen in the progress of their work render the place unsafe. Torgerson v. Minneapolis, St. P. & S. S. M. Ry. Co., 49 N.D. 1096, 194 N.W. 741; Cartwright v. Atchison, T. & S. F. Ry. Co., 8 Cir., 228 F. 872." And see Alpha Portland Cement Co. v. Curzi, 2 Cir., 211 F. 580, 128 C.C.A. 180.

As stated, plaintiff insists that instruction No. 2, considered in its entirety, submits negligence in failing to provide plaintiff with a reasonably safe place in which to work. If the instruction was so intended, it is clearly erroneous, because of the well established rule that an employer is not the insurer of his employees' safety, and the test as to whether the employer has fulfilled his duty to furnish his employee with a reasonably safe place to work is whether the employer has exercised reasonable care to make it safe. Huffman v. Terminal R. Ass'n of St. Louis, Mo.Sup.,

281 S.W.2d 863, 868(4). The instruction does not submit that test, nor require a finding of negligence in failing to make the place of work reasonably safe.

 Defendant contends that instruction No. 7 is erroneous because it limits the issue of defendant's negligence solely to the question of defendant's knowledge that there was some danger of injury to some of defendant's employees by the use of sodium bichromate; and that the instruction eliminates from the jury's consideration the issue of whether or not the defendant had exercised reasonable care to prevent injury from sodium bichromate.

The instruction is as follows:
"In considering and determining whether the defendant was or was not negligent under the evidence and the instructions and whether such negligence, if you so find, directly caused all or part of the physical conditions claimed by plaintiff, you are instructed that it is not necessary for you to believe and find from the evidence that by the exercise of ordinary care, the defendant could or should have known or realized that plaintiff was one of the employees who would be injured, if you so find that he was, by the sodium bichromate in Dearborn No. 517, if any, or that the injury, if you so find, would take place in the precise manner in evidence.

"But, on such issues, it is sufficient if you believe and find from the evidence that by the exercise of ordinary care, as defined, the defendant could or should have known or realized that the use of such substance by its employees and in the manner in evidence was reasonably likely to cause such injury, if you so find, to some of such employees."

Plaintiff's position is that instruction No. 7 was a cautionary instruction on the issue of knowledge; and that it properly set forth the applicable law, to wit, that, in determining the issue of defendant's knowledge, it was not necessary for the jury to find that defendant should have anticipated the very injury complained of, or have anticipated that it would happen in the exact manner that it did. Plaintiff says that, since it is conceded that defendant had knowledge of the potential injurious effect of chromates, the instruction could not be considered prejudicial; that a reading of this instruction clearly shows that it did refer to all other instructions; and that it must be construed in the light of and together with all other instructions.

We think instruction No. 7 is reasonably subject to the criticism leveled against it and hold that it is erroneous and misleading. The instruction begins with the words, "In considering and determining whether the defendant was or was not negligent under the evidence and the instructions and whether such negligence, if you so find, directly caused all or part of the physical conditions claimed by plaintiff, * * *" and, thereafter, states, "on such issues, it is sufficient * * *" et cetera, in the second paragraph of the instruction. The instruction could well have been understood by the jury as directing a verdict for plaintiff on the basis of the matters stated in said paragraph. The instruction clearly accentuated the error in instruction No. 2 and was not limited to the issue of defendant's knowledge of the dangerous propensities of the sodium bichromate. As we have previously noted, negligence cannot be predicated upon the mere fact that the defendant had knowledge that there was danger to its employees by the use of sodium bichromate in the course of its business.

For the errors noted, the judgment is reversed and the cause remanded.

All concur.